**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **FRANCINE CHAPPLE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case number 4:04cv1115 TCM** |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision

of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying

Francine Chapple's application for disability insurance benefits ("DIB") under Title II of the

Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and for supplemental security income

benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b. Ms. Chapple

("Plaintiff") has filed a brief in support of her complaint; the Commissioner has filed a brief

in support of her answer.[1]

## Procedural History

Plaintiff applied in September 2002 for DIB, alleging a disability since October 2001

caused by headaches, depression, back, hip, and left arm pain, shortness of breath on

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of
the parties. See 28 U.S.C. § 636(c).

exertion, and weakness in her left knee. (R. at 57-59.)[2] Her applications were denied initially and after hearings held in 2003 before Administrative Law Judge ("ALJ") James B. Griffith. (Id. at 17, 225-59.) The ALJ determined that Plaintiff was not under a disability at any time on or before the date of his decision, and denied her applications. (Id. at 11-16.) The Appeals Council denied Plaintiff's request for review of that decision, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the first administrative hearing, in October 2003.

Plaintiff testified she was born on May 28, 1964, and was then 39 years old. (Id. at 228.) She was 5 feet 4 inches tall and weighed approximately 142 pounds. (Id.) This weight was an increase from her normal weight of 125 pounds. (Id.) She was right-handed. (Id.) Plaintiff lived in a two-bedroom apartment with her mother, her granddaughter, her 15-year old daughter, and her 18-year old son. (Id. at 229.) Her mother worked at the post office. (Id.) Plaintiff quit school in the twelfth grade, but later completed her GED. (Id.)

Plaintiff further testified that she last worked in May 2001. (Id. at 229.) Her last job was in home health care. (Id. at 230.) She left that job when her mother had a stroke. (Id.) Plaintiff had also done assembly work at a factory for six years, office cleaning for one, and

_____

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

cashiering at a service station.  (Id.)  Plaintiff explained that she was unable to work because her back hurt as a result of her job in home health care.  (Id. at 231.)  Her back hurt if she stood too long, i.e., for more than 90 minutes.  (Id.)  She was unable to say whether it hurt her back to walk because she doesn't walk.  (Id.)  She wears a back brace when sitting and uses a heat pad at night.  (Id. at 231, 232.)  She last saw a chiropractor for her back eight months ago and stopped taking Vicodin because the medication made her sick.  (Id. at 232.)  She had not talked to her doctor about this side effect.  (Id.)  She settled a lawsuit about the motor vehicle accident, netting approximately $900.00, and a worker's compensation claim, netting $1,087.  (Id. at 233.)

In addition to her back pain, Plaintiff's inability to get along with other people prevents her from working.  (Id. at 234.)  She does not like people telling her what to do and is always angry.  (Id.)  She has contemplated suicide in the past and speaks with an imaginary friend when she (Plaintiff) does something wrong.  (Id. at 235.)  This behavior started two years ago when she started living with her mother.  (Id.)

Plaintiff was then being treated at the Hopewell Center for depression and headaches. (Id. at 234.)  She had been diagnosed with bipolar disorder in 1994.  (Id.)  She used to be treated by Dr. Ammad.  (Id. at 235.)

At this point in Plaintiff's testimony, the ALJ stopped the proceedings.  A child on Plaintiff's lap was apparently playing and disturbing the recording.  (Id.)  The hearing was reconvened in December.  Plaintiff and James Israel testified at this hearing.

Plaintiff then weighed 124 pounds.  (<u>Id.</u> at 240.)  Stress had caused her to lose weight.  (<u>Id.</u>)  Since the first hearing, she, her two children, and her two-year old granddaughter had moved in with a friend and then, with the exception of her son, had recently moved to a shelter after the friend's house was boarded up.  (<u>Id.</u> at 241.)

Plaintiff summarized her work history as she had in the previous history, but then explained that she had left her last job, doing home health care, after her client had died and her employer wanted her to work in Chesterfield.  (<u>Id.</u> at 243-44.)  Plaintiff had no means of transportation to Chesterfield.  (<u>Id.</u> at 244.)

Plaintiff use to see Dr. Ahmad.[3]  (<u>Id.</u>)  She was currently being treated by Dr. Krojanker.  (<u>Id.</u>)  He had prescribed Zoloft for her, but had not given her a diagnosis.  (<u>Id.</u>)  She saw things and heard voices.  (<u>Id.</u>)  When she first saw Dr. Krojanker he wanted to hospitalize her immediately because he considered her a threat to herself and to others.  (<u>Id.</u> at 245.)  She explained that she could not because her children and granddaughter were with her.  (<u>Id.</u>)  She has suicidal thoughts, but does not pursue them because of her children.  (<u>Id.</u>)

Asked to describe her ability to get along with others, Plaintiff replied that she preferred to be by herself, did not like people telling her what to do, and did not like people looking at her in a certain way.  (<u>Id.</u>)  She constantly thinks people are looking at her.  (<u>Id.</u> at 246.)  Other people call her a paranoid schizophrenic; her children simply tell her she is paranoid.  (<u>Id.</u>)  She is always arguing with people or ready for a fight.  (<u>Id.</u>)  For instance,

---

[3]The doctor's name is spelled "Ammad" in the transcript.  The correct spelling is "Ahmad."

the day before she needed to use the telephone at her godmother's house but another woman was using it. (Id.) This woman would not get off the telephone, so Plaintiff unplugged it. (Id.) The woman "ran up on" Plaintiff; Plaintiff "threw her down the steps" and left. (Id.) Plaintiff has this type of interaction with people "[m]ost of the time." (Id.) Plaintiff does not belong to any groups or organizations. (Id. at 250.) She does not socialize with her family, and has associates and not friends. (Id. at 251.) An associate is someone you can talk with but cannot trust, for instance, the woman who drove her to the hearing. (Id.)

Plaintiff was currently taking Seroquel[4] and Trazodone, in addition to the Zoloft. (Id. at 247.) All were prescribed by Dr. Krojanker. (Id.) She had stopped seeing things when on the Seroquel. (Id. at 248.) She used to take Vicodin, but stopped because it had drugs in it and made her sick. (Id. at 248-49.) Before she consulted Dr. Krojanker, she was being treated by a psychiatrist at the Hopewell Center. (Id. at 247.) She stopped seeing Dr. Ahmad because he would simply prescribe medication, which made her sleep all the time, rather than letting her sit and talk as she wished to. (Id.)

Plaintiff had a driver's license. (Id. at 248.) She did not drive, however, because she did not have a car. (Id.) A friend drives her. (Id.)

Asked to describe her physical problems, Plaintiff testified that her lower back hurt. 249.) The pain was worse if she stood for longer than four to five hours, sat for longer than three hours, or sat in a certain way. (Id.) Her left leg hurt her when she walked. (Id. at 250.)

---

[4]Seroquel is an antipsychotic medication. Physician's Desk Reference 639 (55th ed. 2001).

She had surgery on it after being robbed and knocked unconscious in 1991. (Id.) After this head injury, she used to take Ibuprofen but it made her sick. (Id. at 252.) She has bad headaches twice a month that last two and one-half weeks. (Id. at 252-53.) The headaches started after she left her mother's house. (Id. at 253.) She does not sleep well and wakes up every hour. (Id. at 254.)

Asked about her daily activities, Plaintiff explained that she changed her clothes and bathed every day. (Id. at 251.) She sometimes has trouble reading and has to have someone explain things to her. (Id.) She watches television. (Id.) When she was living with her mother, she would cook and keep the house clean. (Id.) She and her children would do the laundry; she and her mother would do the grocery shopping. (Id. at 251-52.)

The ALJ inquired about a notation on a medical record dated the previous October indicating that Plaintiff was applying for a job. (Id. at 254.) Plaintiff explained that she had applied for a job through a temporary service and at the Post Office and Federal Express. (Id.) She was also helping her granddaughter with her ABC's. (Id.)

Plaintiff further testified that she smoked four to five packs of cigarettes a day. (Id. at 255.) When asked how she can afford this, she explained that a friend bought her cigarettes. (Id.)

James E. Israel testified as a vocational expert ("VE").

Asked to assess Plaintiff's previous work experience, the VE first noted that her last year of substantial gainful activity was in 1996. (Id. at 257.) Her prior jobs, whether home

health care, cashier, or factory work, were, as performed, unskilled and in the light and medium range.  (Id.)  She had no transferable skills.  (Id.)

The VE was then asked to assume the following hypothetical worker:

[A] worker able to perform generally at the light exertional capacity as described in the regulations, who would have additional limitations in that the worker should have limited contact with the public on the job, and would be restricted to jobs only requiring understanding, remembering and following simple instructions and directions.

(Id.)  This worker, the VE testified, would be able to perform factory work.  (Id.)  If this hypothetical person also should have limited contact with the public, supervisors, and co-workers, the person would still be able to do a production job but the number of those jobs available would be reduced by 20%.  (Id. at 258.)  The remaining number, however, would be in the thousands.  (Id.)  If this hypothetical person would also have to miss work two days a month for health reasons, there would be no jobs she could perform because an employer would want a reliable attending employee.  (Id.)  If this hypothetical person had a Global Assessment of Functioning ("GAF") of 50,[5] there would be no jobs she could perform.  (Id. at 259.)

**Medical and Other Records Before the ALJ**

_____

[5]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Manual at 34.

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and a medical evaluation report.

As part of the application process, Plaintiff completed, in relevant part, a disability report, a work history report, a claimant questionnaire, and a pain questionnaire. In the disability report, Plaintiff listed October 1991 as the date her impairments first bothered her and October 10, 2001, as the date they prevented her from working. (<u>Id.</u> at 114.) She stopped working in June 2002 because of her depression. (<u>Id.</u>) She had sought medical treatment at the Hopewell Center in 1997 for depression and had begun seeing Dr. Aqeeb Ahmad in July 2002 for her depression. (<u>Id.</u> at 116-18.)

Plaintiff listed nine employers in her work history report. (<u>Id.</u> at 105.) Her longest period of employment was five months. (<u>Id.</u>) As she explained at the hearings, she worked as a cashier at a service station, did home health care, or worked as a janitor. (<u>Id.</u> at 106-12.)

In a claimant questionnaire, completed with the help of a friend, Plaintiff described her disabling symptoms as headaches caused by stress. (<u>Id.</u> at 101, 104.) There was nothing she could do other than take medication to relieve the headaches. (<u>Id.</u> at 101.) She took Celexa, Risperdal,[6] and Trazodone. (<u>Id.</u>) She had no difficulties in going to sleep or staying asleep. (<u>Id.</u> at 102.) She could not walk for a long time in a store and when there needed help with making decisions. (<u>Id.</u>) Her household chores took longer than normal, and she

---

[6]Risperdal is an antipsychotic medication. <u>Physician's Desk Reference</u>, *supra*, note 4, at 1580.

no longer prepared meals.  (Id. at 102-03.)  She has always had a problem getting along with people.  (Id.)  In a supplement to this questionnaire, Plaintiff reported that she had no problem sitting, but her back hurt when she bent over and her left knee gave out.  (Id. at 99.)  She could not lift anything due to the pain in her left arm, and she tired easily.  (Id.)  In a pain questionnaire, Plaintiff described the intensity – throbbing and very severe – and frequency – every other day – of her headache pain.  (Id. at 100.)  Asked to describe any other problems, Plaintiff reported that she suffered from bipolar disorder.  (Id.)  In a headache questionnaire, Plaintiff described the pain as sharp and occurring three times a week.  (Id. at 97.)  The headaches were preceded by anger and accompanied by blurred vision.  (Id. at 98.)  She most often experienced them in the evening.  (Id.)

An earnings report generated pursuant to Plaintiff's DIB and SSI applications listed earnings for the years 1979, 1987 through 1989, inclusive, and 1991through 2002, inclusive. (Id. at 49.)  Her highest annual earnings, $6,496.08, were in 1996 – the year the VE testified was her last year of substantial gainful activity.  (Id.)  Her average annual earnings for the period from 1979 through 2002, inclusive, were $1,297.  (Id.)

Plaintiff's medical records before the ALJ begin on January 28, 2000.

On that day, Plaintiff walked into a clinic at the People's Health Center for a refill on some medication for seborrehic dermatitis (dandruff).  (Id. at 144.)  Fifteen months later, in April 2001, she returned with complaints of depression.  (Id.)  She reported that she was not doing well, was frustrated, and was angry at people.  (Id.)  She had thrown her landlord, a woman, out the window and was being sued.  (Id.)  She was not sleeping or eating well, had

been fired for yelling at coworkers, and was crying herself to sleep.  (Id.)  She was not suicidal.  (Id.)  Xanax and Trazodone were prescribed for her anxiety.  (Id.)  On May 14, Plaintiff went to the clinic for a follow-up visit to check on her medications.  (Id. at 142.) She still had some insomnia and anxiety.  (Id.)  The Xanax dosage was not strong enough. (Id.)  She had had a fight with her father and was going to find another place to stay.  (Id.) Her mother was not speaking to her, but her court date had been continued.  (Id.)  The Xanax and Trazodone dosages were increased, and a Xanax prescription with four refills was called into her pharmacy.  (Id. at 142-43.)  Plaintiff was to return for a follow-up visit in four weeks.  (Id.)  Plaintiff did not keep the next three scheduled appointments.  (Id. at 143.) Plaintiff next went to the clinic on November 13 for gynecological complaints.  (Id. at 141.) She did not keep her next appointment in December.  (Id.)

On July 30, 2001, Plaintiff went to St. Mary's Health Center with complaints of back pain after being rear-ended in her car.  (Id. at 157.)  She had a bruise on her right leg from hitting the steering wheel.  (Id.)  An x-ray showed no fracture.  (Id.)  It was noted in her medical records that her medical history included a manic/depressive illness.  (Id. at 161.) On June 6, 2002, Plaintiff returned to the Center with complaints of lower back pain that had begun the day before.  (Id. at 147.)  She had been trying to lift a 400-pound patient that day and had felt a "pop."  (Id.)  She was told to rest at home that day and given a prescription for Motrin, Vicodin, and Norflex.  (Id.)  She was also to make arrangements to see the worker's compensation doctor before returning to work the next day.  (Id. at 147, 152.)

On July 15, she consulted Ivy Benjamin, M.D., about her neck and back pain. (Id. at 172.) She reported that she had been lifting a patient from the bathtub when she strained her back. (Id.) No x-rays at been taken at St. Mary's, but she had been given Ibuprofen and a muscle relaxant. (Id.) On examination, she had a normal range of motion in her neck and a slightly diminished range of motion in her lumbar spine. (Id. at 174.) On testing, she showed no muscle weakness in her hands. (Id. at 175.) She was diagnosed with lumbosacral and cervical "sprain/strain." (Id. at 176.) She had not yet returned to work, but she was not disabled due to the current injury. (Id. at 177.)

Plaintiff reported four days later that her neck and back were a little better. (Id. at 171.) Treatment was continued. (Id.) On July 22, her cervical and lumbosacral strain were reported to be "resolving." (Id. at 170.) She had a 95% range of motion and was to be discharged from treatment on Wednesday, July 24. (Id.) On that day, Plaintiff reported the pain was gone and her back was fine. (Id. at 166.) She had a complete range of motion in her cervical and lumbosacral spine. (Id. at 167.) Her prognosis was described as "excellent," and she was discharged. (Id. at 169, 170.)

The next month, on August 8, Plaintiff consulted Aqeeb Ahmad, M.D. (Id. at 184–94.) She reported feeling depressed and suicidal. (Id. at 184.) She had a history of cocaine addiction, and was then smoking six to seven packs of cigarettes a day. (Id.) She had been evicted from her home. (Id.) She was described as guarded and suspicious. (Id.) She had a history of a head injury. (Id. at 185.) She was taking Trazadone and Xanax. (Id.)

Her GAF was assessed as 49.[7]  Two weeks later, Plaintiff was prescribed Paxil and Risperal in addition to the Trazadone.  (Id. at 183.)  She reported that she could not hold a job.  (Id.)  Her GAF was then a 55.[8]  (Id.)  The diagnosis was paranoid personality disorder and major depression.  (Id.)  On September 5, this diagnosis was changed to major depression and psychosis.  (Id. at 182.)  Her current GAF and that during the past year was 60.[9]  (Id.)  She had been living with her mother, had gotten into an argument with her, and had thrown a can of soda at her.  (Id.)  She was taking both her old and her new medications and was hearing voices.  (Id.)  At the next, and last, visit on September 19, it was noted that the pharmacist had refused to fill Plaintiff's prescriptions because of her attitude.  (Id. at 181.)  Dr. Ahmad discussed this problem with her.  (Id.)  She was prescribed Risperdal and Celex and was to return in four weeks.  (Id.)  Her GAF remained at 60.  (Id.)

On October 6, 2003, Plaintiff sought outpatient treatment at the Hopewell Center.[10]  (Id. at 203-17.)  During the two-hour visit, Plaintiff reported that she was unemployed and lived with her mother.  (Id. at 205, 212.)  She was angry with her mother and felt like hurting her.  (Id. at 210.)  When her mother drank, she would accuse Plaintiff of stealing from her.

---

[7]See note 5, *supra*.

[8]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders at 34.

[9]Id.

[10]The Center's records refer to Plaintiff as being a previous patient.  There are no earlier records included in the administrative record, and a notation on a Hopewell letter indicates that before her October 2003 visit Plaintiff was last seen in 1995.  (Id. at 139.).

(Id. at 212-13.)  Plaintiff further reported that she was unable to sleep more than two hours a night.  (Id. at 206.)  Although she was tired in the mornings, she had to get up to take care of her granddaughter.  (Id. at 206, 209.)  She had been raised by her grandparents, and had been depressed since her grandmother died when Plaintiff was 15 years old.  (Id. at 206.)  Plaintiff had five children, with ages ranging from 21 to 15.  (Id. at 207.)  She quit school in the eleventh grade when she became pregnant.  (Id.)  She spoke with an imaginary friend when she was upset or under stress.  (Id.)  Her GAF was assessed at 50.  (Id. at 213.)

On December 31, Plaintiff returned to Hopewell Center.  (Id. at 219-24.)  She reported that she was not doing well.  (Id. at 219.)  She had been staying in a shelter, and resented having to follow all the rules.  (Id.)  She spent her day walking around a mall.  (Id.)  She did not like being around people and attributed this trait to being an only child.  (Id.)  When she took her medication, she slept well and did not hear voices.  (Id.)  She would occasionally get angry during the interview but would cooperate.  (Id.)  She denied using either alcohol or drugs, and had not used cocaine for seven years.  (Id. at 220.)  Compliance with her medication, using her time constructively, and keeping her appointments was discussed.  (Id.)  Plaintiff reported that she did take her medication as directed.  (Id.)  Her GAF was then apparently 50.[11]  (Id. at 224.)  The prescription for her medications, including Zoloft and Trazdone,[12] and were renewed by Dr. Krojanker.  (Id. at 221, 224.)

---

[11]The handwriting is almost illegible.

[12]The name of a third medication is illegible; however, Plaintiff testified in the administrative hearing that she was also taking Seroquel.

The ALJ also had before him the results of an October 2002 consultative examination by Elbert Cason, M.D., of Plaintiff pursuant to her complaints of back pain; headaches; a sore left arm and left hip; sporadic shortness of breath; and a left knee that sometimes gave out. (Id. at 195.) Plaintiff attributed the beginnings of her back pain to when she was lifting a patient into a shower. (Id.) The pain was sharp and across her lower back. (Id.) She could not sit or stand for longer than one hour, nor could she walk farther than five blocks. (Id.) Her headaches she attributed to being hit with a piece of wood in 1991. (Id.) They occurred two or three times a week and lasted for two days. (Id.) Approximately once a month, she has pain in her left hip when she goes up stairs. (Id. at 196.) This problem also began when she was hit in the head. (Id.) Her shortness of breath she attributed to her smoking habit – a five pack a day habit. (Id.) On examination, Plaintiff could heel and toe stand and squat. (Id. at 197.) Her gait and station were normal without the need of any assistance device. (Id.) Her range of motion was all within normal limits. (Id. at 197, 199-200.)

Also in October 2002, Charles M. Pap, Ph.D., completed a Psychiatric Review Technique Form ("PRTF"), assessing the severity of Plaintiff's affective disorders, specifically, her major depression with psychotic features. (Id. at 64-77.) He rated the effect of these impairments as "mild" on Plaintiff's ability to function in the area of activities of daily living and "moderate" on her ability to maintain social functioning and to maintain concentration, persistence, or pace. (Id. at 74.) There were no episodes of decompensation,

each of extended duration.  (Id.)  A notation at the end of his report reads that Plaintiff's statements about her symptoms are "fully credible."  (Id. at 76.)

Dr. Pap further assessed the effect of Plaintiff's mental impairments on her ability to function in 20 categories of mental activities.  (Id. at 87-90.)  She was moderately limited in her ability to (a) understand and remember detailed instructions, (b) carry out detailed instructions, (c) maintain attention and concentration for extended periods, (d) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (e) sustain an ordinary routine without special supervision; (f) work in coordination with or proximity to others without being distracted by them, (g) make simple work-related decisions, (h) complete a normal workday and workweek without interruptions from psychologically based symptoms, (i) interact appropriately with the general public, (j) ask simple questions or request assistance, (k) accept instructions and respond appropriately to criticism from supervisors, (l) get along with coworkers or peers, and (m) respond appropriately to changes in the work setting.  (Id. at 79-80.)  She had no significant limitations or there was no evidence of any limitations in the remaining seven categories. (Id.)  Dr. Pap further opined that Plaintiff could perform simple tasks and follow simple two or three step directions.  (Id. at 81.)  Additionally, she should be restricted to a work environment of limited social interaction.  (Id.)

## The ALJ's Decision

The ALJ first noted that Plaintiff's earnings for the period from February 1 to June 5, 2002, established that she had then engaged in substantial gainful activity because she had

earned more than the presumptive amount of $750.00 per month.  (<u>Id.</u> at 12.)  Because that period is foreclosed, the four-month period from October 1, 2001, through January 31, 2002, was also foreclosed.  (<u>Id.</u>)  Thus, the period at issue was after June 5, 2002.  (<u>Id.</u>)  Plaintiff had not engaged in substantial gainful activity during this period.  (<u>Id.</u>)

The ALJ next found that Plaintiff's ability to do basic work activities had been more than minimally limited by her major depression and her spinal strain.  (<u>Id.</u>)  Her headaches, however, were not a severe impairment.  (<u>Id.</u>)  Although she described disabling headaches that lasted two weeks at a time, she seldom complained of headaches to her health care providers and denied having a history of headaches to one.  (<u>Id.</u>)  And, she had been able to work regardless of the headaches, which she described as occurring in the evening.  (<u>Id.</u>)

Her impairments of major depression and spinal strain were not of listing-level severity. (<u>Id.</u> at 13.)  In determining whether these impairments would prevent Plaintiff from returning to her past relevant work, the ALJ evaluated Plaintiff's credibility about the limitations placed by those impairments on her ability to function.  He concluded that the medical evidence did not support her testimony, specifically the records of Dr. Ahmad and the opinion of Dr. Pap.  (<u>Id.</u> at 13-14.)  The records from Hopewell Center were not persuasive because they did not indicate whether they were from a medically acceptable source, e.g., a psychologist or psychiatrist.  (<u>Id.</u> at 14.)  Moreover, the records were apparently from a non-medical source and concluded with the recommendation that Plaintiff undergo a psychiatric evaluation.  (<u>Id.</u>)

Addressing Plaintiff's claims of back pain, the ALJ noted that Dr. Benjamin's reports indicated that the pain had resolved and that Plaintiff's activities in caring for her granddaughter and her job search were inconsistent with her complaints. (Id. at 15.) The ALJ also noted that there were inconsistencies in the record, specifically the varying times that Plaintiff could sit without pain and the differing explanations of why she quit work. (Id. at 14-15.) And, the record indicated that psychotropic medication could control her symptoms. (Id.)

The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to lift or carry 20 pounds occasionally and ten pounds frequently, could sit for six hours in an eight-hour workday, could stand or walk for two hours in an eight-hour workday, could understand, remember, and could follow simple instructions and directions. (Id. at 15.) She should, however, perform work that only involved limited contact with supervisors, co-workers, and the general public. (Id.)

Accordingly, for the foregoing reasons, Plaintiff had the RFC to perform her past relevant work as a small objects assembler/production worker. (Id. at 16.) She was not disabled within the meaning of the Act. (Id.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The

impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 416.920, 404.1520.  See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix

1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based

only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  And, although a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).  The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed."  **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  **Pearsall**, 274 F.3d at 1217.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at 1206-07. When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ erred in his conclusions about her mental RFC and improperly evaluated her credibility. She additionally argues that, because the record supports the assessment of her GAF at 50, the ALJ erred by not finding, based on the VE's

testimony, that she was incapable of performing substantial gainful activity.   The Commissioner disagrees.

"[I]t is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel."  **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000) (alteration added).  Accord **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003).  This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case."  **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added).  This duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004).  See also **Haley v. Massanari**, 258 F.3d 742, 749 (8th Cir. 2001) (holding that ALJ's duty to develop the record includes ordering a consultative examination when such an examination is necessary for the ALJ to make an informed decision); **Barrett v. Shalala**, 38 F.3d 1019, 1023 (8th Cir. 1994) ("The ALJ is required to order medical examinations and tests only if the medial records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."); 20 C.F.R. § 416.917 (setting forth criteria for when a consultative examination will be provided at Government expense).  This duty does not arise, however, if a crucial issue is not undeveloped.  **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th

Cir. 2005); **Stormo**, 377 F.3d at 806. Additionally, although "[t]he current regulations make clear that [RFC] is a determination based upon all the record evidence," **Dykes v. Barnhart**, 223 F.3d 865, 866-67 (8th Cir. 2001), including "'the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations,'" **Krogmeier v. Barnhart**, 294 F.3d 1019, 1023 (8th Cir. 2002) (quoting McKinney, 228 F.3d at 863) (alteration added), "[t]he need for medical evidence . . . does not require the [Commissioner] to produce additional evidence not already within the record," **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (alterations added). The determination of whether an ALJ has failed in his or her duty to develop the record must be made on a case-by-case basis. **Gregg v. Barnhart**, 354 F.3d 710, 712 (8th Cir. 2003).

In the instant case, the ALJ failed in his duty to develop the record as to Plaintiff's current GAF.

As noted by Plaintiff, the VE testified that there were no jobs she could perform if she had a GAF of 50. The records from Hopewell list her GAF as being 50. As noted by the ALJ, however, those records do not indicate by whom this assessment was made, specifically, if it was made by a psychologist or psychiatrist, perhaps Dr. Krojanker, or by a counselor without the necessary qualifications. A GAF of 50 is consistent with other evidence in the record. Plaintiff has a history of not being able to get along with family or others. Her living situation attests to this. She consistently had to change residences after fighting with people. For instance, she had to move after she had a fight with her landlord; she had to move after she had a fight with her father; and she had to move again after she had

- 23 -

a fight with her mother. She did not like her current living situation because she had to follow rules, as she would have to in the workplace. Her work history may also reflect a serious impairment in her ability to keep a job, or a lack of motivation. Additionally, there was some evidence that she had suicidal ideation at times. And, although Dr. Ahmad assessed her GAF in September 2002 as being 60, the previous month he assessed it at 49.[13]

There was also evidence, however, that she did not display any psychotic symptoms when taking medication. And, as noted by the ALJ, her testimony was inconsistent, e.g., her changing explanations as to why she quit her last job.

---

[13]Inexplicably, on his September 5 notes, Dr. Ahmad lists a "60" as being her GAF for the past year.

## Conclusion

Because the question of Plaintiff's current GAF is crucial to a determination of whether she is disabled within the meaning of the Act and because the record was not developed as to that finding, e.g., there was no clarification as to who had assessed her GAF at the Hopewell Center and no mental consultative examination, this case shall be remanded to the Appeals Council for further development of the record consistent with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings consistent with this Memorandum and Order.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of September, 2005.